FRANCES V. HOBDAY *v.* COMPENSATION COMMISSIONER, *and* PENNSYLVANIA GLASS SAND CORPORATION.

(No. 9363)

Submitted September 7, 1943. Decided October 19, 1943.

Kenna and Fox, Judges, dissenting.

*Theodore C. Waters* and *Lacy I. Rice,* for appellant.
*S. Preston Smith* and *Rowland Edwards,* for appellee.

Rose, Judge:

From the allowance of compensation for the death of Robert P. Hobday, claimed to have resulted from silicosis, to Frances Hobday, his widow, made by the State Compensation Commissioner, and confirmed on appeal by the Compensation Appeal Board, this appeal was granted on application of the employer, Pennsylvania Glass Sand Corporation.

This corporation since 1930 has owned and operated an extensive plant near Berkeley Springs in Morgan County for the quarrying and the preparation of glass sand. The deceased's work in this plant began in 1927, and ended in 1937. For one year within this period he worked for an orchard company and for three months of this time, for a railroad company. For about a year under a former owner of the plant his employment was in the building in which the sand was dried and handled; during the last eight months of this period he operated a motor by which rock was hauled from the quarry to the mill. The rest of this ten year period he worked in the quarry. His employment by the appellant company terminated December 3, 1937, by reason of the then condition of his health. He died April 8, 1938, shortly after which his widow made her claim for compensation, in which, for a statement of the cause of the decedent's death, reference is made to "Physicians' report attached." No such

report remains attached to this paper or can be identified; but the claim was docketed and the case proceeded in by all parties as one for death from silicosis.

Under date of October 5, 1938, the Commissioner ordered that the claim be disallowed on the ground that the death of the employee was not due to silicosis, to which action the claimant immediately objected. The case was then referred to the Silicosis Medical Board but successive continuances followed, resulting in nothing done until early in 1940, at which time the claimant's present counsel appeared. Then followed hearings at Berkeley Springs on the non-medical questions. Under date of August 23, 1940, the Commissioner made an order, setting aside the order of October 5, 1938, finding for the claimant on the non-medical issues, and again referring the case to the Medical Board. The hearing before that board resulted in a report under date of February 6, 1941, favorable to the claimant; and, accordingly, the Commissioner, on February 12, 1941, allowed the widow's claim by order of that date. To the report of the Medical Board the employer filed exceptions on the 18th day of February, 1941, after which a further hearing was had by that board at which evidence on the exceptions was taken. On the whole evidence before it the Medical Board made a final report under date of October 3, 1941, which again supported the claim. On October 7, 1941, the Commissioner made a final order confirming his order of February 12, 1941, and allowing Mrs. Hobday's claim. Appeal was taken by the employer to the Compensation Appeal Board which affirmed the Commissioner's award.

The assignments of error may be summarized under three heads: (1) That the record fails to show that the decedent came to his death from silicosis under circumstances justifying the award; (2) that the specimen of the decedent's lung from which the claimant's sole medical witness testified was not identified; and (3) that the actual decision and order made by the Commissioner and affirmed by the Appeal Board does not find that the de-

cedent died from silicosis. We shall consider these propositions in their inverse order.

The final order of the Commissioner is in part as follows:

"This claim came on again to be considered this 7th day of October, 1941, upon orders heretofore entered herein, and more particularly upon the Commissioner's order of February 12, 1941, upon timely protest thereto by the employer, Pennsylvania Glass Sand Corporation, upon a hearing duly granted and held thereon, at a meeting of the Silicosis Medical Board, on August 7, 1941, upon a consideration of the transcript, and the recommendation of the Board, on October 3, 1941, upon a review thereof, and of the entire record, upon consideration of all of which, the Commissioner is of the opinion to, and does hereby order that his said order of February 12, 1941, be and the same is hereby affirmed, in full force and effect, and compensation awarded to Mrs. Frances V. Hobday, as the dependent widow of the deceased herein, Robert P. Hobday, as it appears that the said deceased came to his death as the result of chronic tuberculosis, aggravated by exposure to silicon dioxide dust, upon the following findings of fact: * * *."

Then follows a specific finding of the matters required by statute, Acts 1935, Chapter 79, Section 11, Sub-sections (a), (b), (c), (d), (e), and (f). The criticism is that this order affirmatively shows that the Commissioner found that the "deceased came to his death as the result of chronic tuberculosis, aggravated by exposure to silicon dioxide dust", which, it is argued, expressly negatives a death by silicosis. We cannot adopt this view of the record.

The orders and records made by administrative and quasi-judicial bodies are not required to have the fullness and legal completeness of courts of law and chancery. A direct finding in substantially the language of the statute that the decedent came to his death from silicosis would have been much better form, but was not absolutely

necessary. If the papers in the case, as a whole, suffice to make it clear that the Commissioner did in fact approve and allow the claimant's claim it will be treated as a finding in her favor. The language last quoted above does not purport to be a disposition of the claim, but is merely a statement of one of the facts appearing to the Commissioner as a basis for his action. The actual decision of the Commissioner is found in these words, "* * * the Commissioner is of the opinion to, and does hereby order that his said order of February 12, 1941, be and the same is hereby affirmed, in full force and effect, and compensation awarded to Mrs. Frances V. Hobday, as the dependent widow of the deceased herein, Robert P. Hobday * * *."

The order of February 12, 1941, as so affirmed, therefore, must be looked to. This order is informal but perfectly clear. It is on a printed form used in the Commissioner's office, at the head of which there are blanks to be filled in by which the parties and the character of the claim are shown. Then follows a space in which is typed brief memoranda of the proceedings had and other notes and comments. At the foot of the page is printed a form, which, by striking out words or filling in blanks, becomes a formal order either allowing or disallowing the claim. The caption on this sheet shows that the claim is by Frances V. Hobday, as the widow of Robert Hobday. The "Description of injury" is given as "Silicosis, fatal". The order duly signed by the Commissioner is as follows:

"Feb. 12, 1941

"On this day the above claim, together with the proof on file was presented to the Commissioner, considered and a finding of facts made as follows: The injury was received in this state in the course of and resulting from the employment. The claim therefore is allowed, and it is ordered that requisition be made on the Auditor for warrants covering the award as set out above, and the claim Continued."

This is a plain adjudication and allowance of the plaintiff's claim based on her husband's death from silicosis. It is perfectly clear, we think, from the record as a whole that the plaintiff's claim was for death from silicosis and that the claim was allowed and an award made to the claimant. This was sufficient to make the appellant's third assignment of error untenable.

The state of the record which gives rise to the second assignment of error is unfortunate, and should have been avoided, but we think there is no defect sufficient to be fatal to this claim. On or about July 15, 1941, Dr. Leroy U. Gardner, pathologist and Director of Saranac Laboratory for the study of tuberculosis, of Saranac Lake, New York, received from an undertaker at Berkeley Springs, West Virginia, two specimens of lung as follows: (1) "Two small pieces of lung * * * mailed by Dr. Dardinski." and (2) "the entire right lung, and portions of the left". Accompanying this second specimen of lung were two affidavits purporting to identify the same: One affidavit by Dr. D. J. Shaw of Berkeley Springs, who assisted in the autopsy on decedent's body, and one by C. L. Hunter, the undertaker of that town, who embalmed and buried his body. Nothing to identify the specimen from Doctor Dardinski accompanied it, and no identification of this specimen is offered in evidence. All testimony of Doctor Gardner relating thereto is therefore, inadmissible; but as he found nothing from this specimen to sustain the plaintiff's case, this rejection is of no moment.

It is objected that the affidavits cannot be looked to for any purpose. But these affidavits were at least, labels and purport to show the identity of this specimen. It was not traced from hand to hand. This constitutes a bad hiatus in the chain of evidence offered to identify this specimen. Still this much remains: Doctor Pendergrass, by X-ray films made in 1936 and 1937, found the decedent's right lung to have a cavity and to have a tubercular scar at its apex. The doctors who removed the lungs from the deceased's body retained them intact excepting

the parts of the left lung which had been sent to Drs. Dardinski and Ehrich. Doctor Gardner did receive immediately after the time of shipment shown by the "labels", the specimen aforesaid, and he states that the right lung did show a tubercular scar at its apex and a cavity below. There is, thus, not a total lack of identification. There is no hint in the record of fraud, or substitution of a foreign specimen, or any affirmative evidence against the identity of this particular specimen of lung. In consideration of this showing in the record, incomplete as it is, and of the liberality permitted in such proceeding, we do not feel justified in rejecting Doctor Gardner's testimony based on his examination of this lung.

The testimony on the merits of the case is voluminous and can be only briefly adverted to.

On the question of the decedent's exposure to silicon dioxide in harmful quantities the employer offered no evidence. The claimant examined as witnesses, eleven workmen who for different lengths of time during deceased's employment worked in the quarry with, or near, him. The quarry was high up the mountainside, and open in front and overhead. Its face is estimated as one thousand feet or more in width along the mountainside and its depth back into the ledge about one hundred feet. The rock is ninety-nine percentum pure silica. The rock is broken from the natural ledge by "big shots", which throw down vast segments of the wall. These fragments are reduced by further shots of dynamite inserted in drilled holes or laid on the top of the rocks and covered and weighted down by sand and gravel. The latter are called "mud packs". The original shots are ordinarily several days or weeks apart; the secondary shots may occur several times a day. After a shot a dust fog hangs over the site for a considerable time of such density that work in it is impossible. Ordinarily this is dispelled or diluted by air movements so as to permit resumption of work in intervals lasting to half an hour, depending on the humidity and movement of the air. Six rail tracks

are on the floor of the quarry on which are operated the mine cars for carrying the stone to the crushing mill. The sand and gravel are cast into the cars by shovels; the stones by hand. Stones too large for handling are broken up by sledges. This loading of the cars produces dust continually. The loaders were paid by piece work and in practice ordinarily worked whenever the dust was bearable. This dust is shown in a number of cases to have clogged nasal passages, etc. No apparatus for protection of the worker against dust was used or provided. No evidence of the actual quantum of silica in the air was tendered.

The deceased worked in this quarry as a loader for all but one year and four months of the period extending from 1927 to April, 1937, and operated the motor tram in and out of the quarry from April, 1937, to December 3, 1937. There is, thus, no possible question but that he was continuously exposed to this quarry dust for this long period. The rock was almost pure silica. From this and this alone the dust was made. The continuous dust necessarily rising from the shoveling of the sand, gravel and stone, and the breaking of the boulders with sledges; the daily clouds of dust from the "mud pack" explosions into which the deceased returned with other workmen as soon as the dust became physically endurable; and the occasional larger blasts — these facts, undisputed by any evidence, and fully established, are such that this Court cannot say as a matter of law, that the Commissioner erred in holding that the decedent was exposed to silicon dioxide dust in harmful quantities within the time and under the circumstances required by the statute to be shown as a basis for compensation.

The sole remaining question is whether the decedent, after this exposure, did in fact die of "silicosis" as that term is used in the statute. It is not the mere exposure to silicon dioxide dust, however harmful, that justifies compensation. The exposure must produce silicosis, which,

in turn, must produce the death. That disease is defined by the statute thus:

> "For the purpose of this article, silicosis is defined as an insidious fibrotic disease of the lung or lungs due to the prolonged inhalation and accumulation sustained in the course of and resulting from his employment, of minute particles of dust containing silicon dioxide ($SiO_2$) over such a period of time and in such amounts as result in the substitution of fibrous tissue for normal lung tissues; and the term 'silicosis' as used herein shall also include silicosis accompanied by tuberculosis of the lungs evidenced by the presence of tubercle bacillus in the sputum." Acts 1935, Chapter 79, Section 5.

The disease is further divided by the statute into three stages:

> "An employee shall, for the purposes hereof, be deemed to have silicosis: (1) In the first stage when it is found by the commissioner that the earliest detectable specific signs of silicosis are present, whether or not capacity for work is or has been impaired by such silicosis; (2) In the second stage when it is found by the commissioner that definite and specific physical signs of silicosis are present, and that capacity for work is or has been impaired by that disease; (3) In the third stage when it is found by the commissioner that the employee has silicosis accompanied by tuberculosis of the lungs evidenced by the presence of tubercle bacillus in the sputum." Acts 1935, Chapter 79, Section 7.

It is thus seen that silicosis in the third stage is a compound malady, consisting of simple silicosis accompanied by a stated degree of tuberculosis. The statute provides that:

> "* * * (d) If the employee dies from silicosis within one year from the date of the last exposure of the employee to silicon dioxide dust in harmful quantities, the benefit shall be in the amounts and to the persons provided for in section one,

article four of this chapter (Code, 23-4-1); as to such benefits sections eleven to fourteen, inclusive, of article four of this chapter (Code, 23-4-11 to 14) shall apply." Acts 1935, Chapter 79, Section 7.

The statute does not require the tuberculosis to be caused or even preceded by the silicosis proper, but only that it accompany that disease. But even if we were to hold that it must be shown that the silicosis, as distinguished from the tuberculosis caused the death, the Commissioner's finding could still be sustained, since one medical witness testified that, in his judgment, the silicosis which he found, activated the latent, or dormant tuberculosis, and caused it to spread, thus causing the death. This combination of silicosis and tuberculosis is by the very language of the statute still "silicosis" as the term is used therein. No distinction is made in the statute as to the amount of simple silicosis, or as to the relative contribution of the two diseases, separately, or jointly, toward the disability or death of the victim. The two diseases are legally one when they co-exist, to-wit, silicosis; hence disability or death from one or both is still death or disability from silicosis in the eye of the law. This decedent in his lifetime would have been entitled to compensation as one totally disabled, whether the effect arises from one or the other branch of the compond affliction. The death of an employee caused by the same joint diseases, by the very terms of the statute, entitles a dependent to compensation. This is simple consistency in the statute.

This statutory assimilation of tuberculosis into silicosis appears to have a substantial factual and scientific basis. In Gray's Attorneys' Textbook of Medicine, Second Edition, at page 1066 is this statement: "As a matter of fact, silicosis rarely causes disability until secondary infection, usually tuberculosis, develops. It has frequently been said that silicosis is not in itself a disabling disease. Thousands of workers have major lung changes, but continue

work for years thereafter with little or no complaint. However, tubercule bacilli grow readily in the silicotic lung, and develop with great rapidity, usually with fatal outcome." Cecil, Textbook on Medicine, Fourth Edition, at page 883, discussing silicosis, says: "Clinically, the process is recognizable as a disease only in its advanced stages, either by increased dyspnea on exertion, or by the symptoms of tuberculosis to which it predisposes." For judicial discussions of the relation between silicosis and tuberculosis, see: *In re Jefferies,* 105 Ind. App. 349, 14 N. E. 2d 751; *Svoboda* v. *Mandler,* 133 Neb. 433, 275 N. W. 599; *Galeota* v. *United States Gypsum Company,* 123 Fed. 2d 947; *Ruffertshafer* v. *Robert Gage Coal Co.,* 291 Mich. 254, 289 N. W. 151; *Golden* v. *Lerch Bros., Inc.,* 211 Minn. 30, 300 N. W. 207.

The certificate of death, made out by Doctor Shaw, the family physician (not called as a witness) gives the "principal cause of death and related causes" as "Pulmonary Tuberculosis", but states also that the "Contributory Cause of importance not related to principal cause" is "Possible Silicosis." The autopsy was performed by Doctor Shaw, and Doctor Martin, the employer's physician, who report no finding of the cause of death, but do report that Drs. Dardinski, Ehrich, and Krumbhaar, to whom sections of the left lung were sent, concluded that the cause of death was "pulmonary tuberculosis". Dr. Martin, who examined the deceased in 1936 and 1937, and who took him to the Hopemont Tuberculosis Sanitarium, discovered tuberculosis but negatived silicosis. Doctor Cadden, the superintendent and medical supervisor of that institution, found tuberculosis in an advanced stage but no evidence of silicosis. Doctor Pendergrass, a radiologist of the Medical School of the University of Pennsylvania, and a specialist on silicosis, and Drs. Ehrich and Krumbhaar, pathologists of that institution, who examined a specimen of lung, found tuberculosis, but no silicosis therein. On the other hand, Doctor Gardner, who examined the right lung and the upper portion of the left,

found scattered silicosis nodules, localized principally back of, or under, the scar at the apex of the right lung, which he thinks would not have been detectable by X-ray alone, and concluded that these nodules "reactivated" the old or latent tuberculosis at that point, from which it spread throughout the lung, in which wider areas he found evidence of further silicosis nodules, modified and partly concealed by subsequent tubercular developments.

The testimony of the medical witnesses is very full, apparently fair, and of seemingly high credibility. Five found no silicosis, but three of these had access to only a small portion of the left lung, while the other two examined the deceased only in life, one without the aid of X-ray. The claimant's medical witness agrees that no silicosis was discoverable in the left lung, and further says that the silicosis nodules in the right lung could not have been detected by X-ray while the subject was living, by reason of the old scar tissue covering them, and of subsequent tubercular effects by which other nodules were covered, modified, or partially destroyed. No witness disputes this limited finding. Thus, there is no direct disagreement on facts among the medical witnesses; and the only disagreement in judgment is between Drs. Gardner and Pendergrass. The former testifies to the existence of silicotic nodules in the upper part of the right lung which, in his judgment, activated the dormant tuberculosis formerly existing at that point and caused that disease to spread throughout the lung. Doctor Pendergrass, after study of Doctor Gardner's testimony, says "I personally question Dr. Gardner's opinion on the identity of that nodulation. Secondly, assuming that those are silicotic nodules, I don't believe that it is extensive enough to activate and lead to this man's death". The right lung, in which these findings were made, was produced before the Medical Board by the claimant for examination by witnesses of the board, but no examination was made.

The appraisal of this highly technical evidence is extremely difficult, if not impossible, by the Court, the Ap-

peal Board, or the Commissioner. By statute this duty, in the first instance, is cast upon the Medical Board, whose decision is made conclusive, unless excepted to. In this case the report was excepted to, and rebuttal testimony was taken, by which the conclusiveness, but not the persuasive character of the report was neutralized. That report was as follows:

"(a) We have carefully reviewed the evidence presented in the above styled claim, and find sufficient evidence to justify a diagnosis of silicosis in its third stage, and tuberculosis.

"The evidence on which we base our findings is as follows:

"(b) An industrial history of having been employed during the period of approximately ten years, during which time he was exposed to dust containing silicon dioxide in sufficient quantities to have produced silicosis.

"(c) Dr. Eugene Pendergrass, Dr. Leroy Gardner, Dr. A. V. Cadden and Dr. George O. Martin appeared before this board. X-ray films were presented by Dr. Pendergrass and also by Dr. Cadden. These films failed to reveal the evidence of silicosis. However, there was a post mortem examination of the lungs performed by Dr. Gardner who was able to demonstrate the presence of a rather marked local silicosis in the region of the tuberculosis.

"It is the opinion of this board that this man had a chronic tuberculosis which was aggravated by the exposure to silicon dioxide. This produced his death."

The claimant's evidence convinced the Medical Board that the deceased had "silicosis in the third stage" at the time of his death. True it further reports that his death was caused by one element of the disease, rather than the other. But this matters not. The statute has relieved the Commissioner and the Court from the difficult and often impossible task of measuring the malignant results of one branch of the disease against those of the other.

If the victim die of one, or of the other disease when they co-exist, or of the combined effect of both, the death is from "silicosis" as expressly defined in the statute.

We cannot say that, as a matter of law, the decision of the Commissioner, affirmed by the Appeal Board, did not have a sufficient basis in the evidence. Accordingly, the order appealed from will be affirmed.

*Affirmed.*

Fox, Judge, dissenting:

I am in accord with the holding of the majority except on point 6 of the syllabus. I think that holding furnishes a basis for future contentions that death from tuberculosis, accompanied by silicosis, in any degree whatever, is compensable. I do not think the Legislature intended such result, and I am compelled to dissent from that construction of the silicosis statute.

Statutes providing for compensation for bodily impairment or death resulting from silicosis are of comparatively recent origin. In February, 1933, the case of *Jones, Admx.* v. *Rinehart & Dennis Co.*, 113 W. Va. 414, 168 S. E. 482, was decided. It was there held that, under then existing statutes, silicosis, being an occupational disease, was not compensable, and that such statutes did not bar actions for negligence of an employer which had resulted in such disease. We assume the same ruling would necessarily have been applied to the more prevalent disease of tuberculosis. The Legislature, at its Regular Session in 1935, Chapter 79, enacted a law providing for compensation for silicosis, set up a separate fund out of which such compensation could be paid, the amount thereof, and provided a scale of payments to be paid into the fund by employers who desired to avail themselves of the provisions of the act.

The title of the act reads as follows: "AN ACT to amend chapter twenty-three of the code of West Virginia, one

thousand nine hundred thirty-one, relating to workmen's compensation by the addition of a new article thereto designated as article six, consisting of sections one to eighteen, inclusive; providing for compensation for disability, disablement or death resulting from silicosis, and defining silicosis."

Section 5 of the act, provides, among other things, that "Where an employee suffers from the disease of silicosis as hereinafter defined, or dies as the result of such disease, and the disease is due to the nature of an occupation or process in which he was employed at any time within one year previous to such disease, and claim therefor has been made within one year after the last exposure of said employee to silicon dioxide dust in harmful quantities, the employee, or in case of death his dependents, shall be entitled to compensation for silicosis as provided herein: * * *". The same section also provides, "For the purpose of this article, silicosis is defined as an insidious fibrotic disease of the lung or lungs due to the prolonged inhalation and accumulation sustained in the course of and resulting from his employment, of minute particles of dust containing silicon dioxide ($SiO_2$) over such period of time and in such amounts as result in the substitution of fibrous tissue for normal lung tissues; and the term 'silicosis' as used herein shall also include silicosis accompanied by tuberculosis of the lungs evidenced by the presence of tubercle bacillus in the sputum".

Section 7 classifies the different stages of silicosis and provides: "An employee shall, for the purposes hereof, be deemed to have silicosis: (1) In the first stage when it is found by the commissioner that the earliest detectable specific signs of silicosis are present, whether or not capacity for work is or has been impaired by such silicoses; (2) In the second stage when it is found by the commissioner that definite and specific physical signs of silicosis are present, and that capacity for work is or has been impaired by that disease; (3) In the third stage when it is found by the commissioner that the employee has sili-

cosis accompanied by tuberculosis of the lungs evidenced by the presence of tubercle bacillus in the sputum".

It is the phrase "accompanied by tuberculosis" which furnishes the basis for the majority holding. In the opinion of the majority, as I understand, tuberculosis, wherever and however contracted, accompanied by the slightest trace of silicosis, whether harmful or not, is compensable. I do not think the Legislature intended to go that far, or that the statute in question should be so construed.

No doubt the Legislature was acquainted with the fact that tuberculosis germs lurk in the body of every human being, and that as applied to the respiratory system, and particularly the lungs, silicosis predisposes to tuberculosis. The quotations from medical authorities, contained in the majority opinion, show that tuberculosis grows more readily in lungs affected by silicosis, and, we may assume, that fact was recognized by the Legislature. In other words, the legislative action was prompted by a desire to provide for what was known to be one of the probable results of silicosis. In my opinion, it was this situation which led the Legislature to provide that when and if tuberculosis developed as the result of silicosis and, as in this case, death occurred, compensation should be paid; or where death did not occur, should be classified as third stage silicosis, carrying greater compensation than other stages thereof mentioned in the act.

I do not mean to contend that where there is existing tuberculosis, latent or active, and there is a clear showing that silicosis has activated and made the tuberculosis virulent, and death has occurred therefrom, compensation should not be paid. In such a case it would be reasonable to say that silicosis was the direct, though possibly not the immediate cause of death. But I think that under a statute designed to compensate for death or bodily impairment from silicosis, no compensation should be granted for other types of disease, unless there is a clear showing that such disease resulted from silicosis, or that

it was aggravated and made virulent by such disease, and that death or serious bodily impairment resulted therefrom.

I do not wish to go into the question of the medical and expert testimony. Suffice it to say that the majority opinion is based on the testimony of one witness who thinks he located a slight trace of silicosis in the extreme upper part of one lung of the decedent; other witnesses, equally qualified, testified that they found no such signs or traces of silicosis in any part of decedent's lung which they examined. One witness thinks that the slight trace of silicosis he found activated the existing tuberculosis and caused death. The other witnesses who testified on the subject were of a different opinion. In my judgment, the preponderance of the evidence supports the latter theory. Yet the medical board adopted the first theory, and it has been followed in all subsequent findings and orders and by the majority opinion. I do not believe that these rulings are justified by the record.

If I believed that the Legislature intended the statute which it enacted to have the result now reached by the majority holding, I would raise no objection to such result. I think the Legislature had the power to provide for compensation in cases such as we have before us, had it desired to do so. But I do not think it so intended. In my opinion, it was intended to compensate for bodily ailment or death resulting from silicosis. It contemplated that one result might be tuberculosis, and it made provision therefor. I think this might fairly be extended to include cases where there was a clear showing of reactivation of existing tuberculosis, but that is as far as it was intended to go. Under the majority holding there will rarely be a case of death from tuberculosis which will not be held compensable, where the decedent has otherwise passed the statutory test, and there is the slightest trace of silicosis. It will be contended, as here, that such silicosis, however slight, activated existing tuberculosis causing death. The present case goes to the

extreme in the first instance, and, following the majority holding, I cannot imagine a case where the test laid down therein cannot be made, if a claimant can show that his decedent worked where silicon dust in harmful quantities was present, and there is the slightest trace of silicosis. And so, in effect, we will be required to compensate for tuberculosis in the absence of any clear showing that the same resulted from silicosis.

I do not think the record before us justifies the order awarding compensation, and I would reverse the same without prejudice to the rights of claimants or their dependents to have compensation awarded in cases where there is a clear showing that tuberculosis, which is the immediate cause of death, has, in fact, been caused or accelerated by silicosis.

I am authorized to state that Judge Kenna joins in this dissent.