This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**MELINDA McPEEK and
GREG SHUMAN,**

    Plaintiffs-Appellants,

v.                                    **NO. 27,424**

**THE HUBBARD MUSEUM,
a foreign corporation,**

    Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY
Karen L. Parsons, District Judge**

Daniel M. Faber
Albuquerque, NM

for Appellants

Billy R. Blackburn
Albuquerque, NM

for Appellee

Judge, Kostura & Putman, P.C.
John Judge
Austin, TX

National Employment Lawyers Association
Stefano Mescato, NELA Program Director
San Francisco, CA

for Amicus Curiae
National Employment Lawyers Association

**MEMORANDUM OPINION**

**FRY, Chief Judge.**

Plaintiffs Melinda McPeek and Greg Shuman appeal from an order granting summary judgment in favor of Defendant Hubbard Museum, their former employer. Plaintiffs sued Defendant for retaliatory discharge, claiming that Defendant fired them in violation of public policy when it terminated Plaintiffs' employment based on its belief that Plaintiffs had reported to a state official that Defendant had committed an act of fraud against the state. The district court determined that Plaintiffs could not establish their claims for retaliatory discharge and entered summary judgment for Defendant. We affirm.

**BACKGROUND**

Defendant is the Hubbard Museum, a nonprofit corporation that once owned the Hubbard Museum of the American West in Ruidoso Downs, New Mexico, along with other historic properties in Lincoln County. Plaintiff Shuman was employed by Defendant as director of exhibits, and then, for one month prior to his termination, as the acting director of the Hubbard Museum of the American West. Plaintiff McPeek was employed by Defendant as its curator of collections.

In early 2004, the state apparently asked if it might be able to acquire the Hubbard Museum of the American West and certain of Defendant's historic

properties. Representatives of Defendant and the state entered into discussions about the possibility that Defendant would make a gift to the state of these assets. The discussions resulted in a letter of intent, signed July 7, 2004, which included the following terms:

> The Museum proposes to gift the greater part of its real and personal property to the State.
>
> . . . .
>
> Some items will be excluded, principally those associated with the "Race Horse Hall of Fame[.]" A complete inventory of all items to be gifted will be developed through a final agreement (Agreement) reached between the Hubbard Museum and the State's Department of Cultural Affairs.
>
> . . . .
>
> All terms and conditions of the proposed transaction will be stated in the Agreement to be negotiated, agreed and executed by the [p]arties.
>
> . . . .
>
> Neither party intends to be bound by any oral or written statements or correspondence concerning the Agreement arising during the course of negotiations, notwithstanding that the same may be expressed in terms signifying a partial, preliminary, or interim agreement between the Parties.

In October 2004, Jean Stoddard, the then-acting director of the Museum of the American West, told Plaintiffs that R.D. Hubbard, the museum's president, did not want three significant pieces in the collection to be given to the state because he

4

wanted to keep them. These were two paintings by Frederic Remington and a bronze sculpture by C.M. Russell, which together were valued at approximately three million dollars. These three pieces belonged to a part of Defendant's collection called the Anne C. Stradling collection. Plaintiffs informed Stoddard that the Stradling Foundation prohibited the withdrawal of these three pieces from the collection and that such withdrawal would constitute a violation of the American Association of Museums' code of ethics. In response to Plaintiffs' concerns, Defendant decided to deaccession the three pieces. Defendant followed Plaintiff Shuman's instructions for doing so, and the deaccessioning process that was ultimately followed was apparently in accordance with the code of ethics.

In the meantime, however, Plaintiff McPeek had grown concerned that the state might not be aware that the three pieces had been deaccessioned and would therefore not be part of the gift. In January 2005, McPeek contacted Maureen Russell, the head conservator of what the parties refer to as the "State Museum," to inform her that the three pieces had been deaccessioned. Russell asked McPeek to fax her Defendant's internal memos and documents relating to the deaccessioning, which McPeek did.

In January 2005, Defendant gave the state an inventory of items to be included in the proposed gift. That inventory, the only one ever provided to the state, did not include the three deaccessioned works. After receiving the inventory, Stuart Ashman,

the state's director of cultural affairs, contacted Stoddard about its contents. Stoddard informed Ashman that the two Remington paintings and the Russell sculpture had been deaccessioned. On February 7, 2005, the state told Defendant that it would not accept the gift. Defendant fired Shuman that same day. Defendant fired McPeek on February 21, 2005.

Plaintiffs sued for retaliatory discharge, alleging that Defendant fired them based on Defendant's belief that both Plaintiffs were involved in informing the state about the deaccessioning of the three works of art. Plaintiffs alleged that McPeek's act (and Shuman's supposed act) of discussing the matter with the state was supported by a public policy that encourages citizens to report fraud to the state. Following discovery, Defendant moved for summary judgment. The district court granted the motion and denied Plaintiffs' motion to reconsider. It noted that Plaintiffs' claim was based on the public policy expressed in *Garrity v. Overland Sheepskin Co.*, 1996-NMSC-032, ¶ 17, 121 N.M. 710, 917 P.2d 1382, that an employer may not terminate an employee who in good faith and with probable cause reports crime in the workplace. The district court concluded that McPeek did not have probable cause to believe that Defendant had committed or intended to commit fraud against the state when she made her report to Russell. As a result, her report to the state that the three artworks had been deaccessioned was not a protected act under *Garrity*. The basis of

6

Shuman's claim was that Defendant fired him due to its belief that he engaged in the same conduct as McPeek. As a result, the district court also determined that Shuman could not prevail on his claim for retaliatory discharge. Plaintiffs appeal.

**DISCUSSION**

An appellate court reviews the granting of a motion for summary judgment de novo. *Beggs v. City of Portales*, 2009-NMSC-023, ¶ 10, 146 N.M. 372, 210 P.3d 798. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Tafoya v. Rael*, 2008-NMSC-057, ¶ 11, 145 N.M. 4, 193 P.3d 551 (internal quotation marks and citation omitted).

Plaintiffs were at-will employees, and as a general rule, employment at will can be terminated by either the employer or the employee for any reason or for no reason at all. *See Trujillo v. N. Rio Arriba Elec. Coop., Inc.*, 2002-NMSC-004, ¶ 22, 131 N.M. 607, 41 P.3d 333 (filed 2001). A retaliatory discharge action provides a "narrow exception to the terminable at-will rule" when an employee is terminated in violation of public policy. *Silva v. Albuquerque Assembly & Distrib. Freeport Warehouse Corp.*, 106 N.M. 19, 21, 738 P.2d 513, 515 (1987). In order to establish a claim for retaliatory discharge, an employee must demonstrate that (1) the employee was discharged because she or he performed an act that public policy has authorized or

encouraged, or refused to perform an act that public policy would prohibit; (2) the employer either knew or suspected that the employee's act involved a protected activity; (3) there was a causal connection between the employee's protected actions and the employer's act of discharging her or him; and (4) the employee suffered damages. *Weidler v. Big J Enters. Inc.*, 1998-NMCA-021, ¶ 23, 124 N.M. 591, 953 P.2d 1089 (filed 1997).

With respect to the first requirement, this Court has stated: "A general allegation that the discharge contravened public policy is insufficient; to state a cause of action for retaliatory or abusive discharge the employee must identify a specific expression of public policy." *Vigil v. Arzola*, 102 N.M. 682, 690, 699 P.2d 613, 621 (Ct. App. 1983), *rev'd on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984), *overruled in part on other grounds by Chavez v. Manville Prods. Corp.*, 108 N.M. 643, 649, 777 P.2d 371, 377 (1989). In *Vigil*, we explained that in New Mexico the "specific expression of public policy" prohibiting an employer from firing an employee may be found in four kinds of legislative or judicial statements: The first is in statutes, such as the New Mexico Human Rights Act, NMSA 1978, §§ 28-1-1 through -15 (1969, as amended through 2007), that provide both that an employer may not terminate employees on particular grounds and a remedy in the event of such termination. *See Vigil*, 102 N.M. at 688-89, 699 P.2d at 619-20. The second is in

8

statutes, such as NMSA 1978, Section 1-20-13 (1969) (stating that an employer may not fire an employee "because of the employee's political opinions"), that prohibit an employer from firing an employee on specified grounds but do not provide a specific remedy for an employee who has been so terminated. *See Vigil*, 102 N.M. at 689, 699 P.2d at 620. The third is when a statute defines a public policy that governs the employee's conduct but does not provide the employee with either a right not to be terminated in violation of that policy or a remedy for such termination, in which case the employee must seek judicial recognition of both the right and the remedy. *See id.* An example of this third type is when an employer fires an employee for refusing to violate a criminal law: The policy is found in the law prohibiting the employee from engaging in the conduct, and the judiciary must recognize an employee's right not to be fired for obeying the law and a remedy for the termination. *See id.* (citing examples of termination when an employee refuses to commit perjury or engage in price fixing). The fourth type of expression of public policy is when there is no legislative enactment at all that directly addresses the employee's conduct, but the judiciary determines that, based on other relevant statutes or an implicit public policy, both a right and a remedy should be recognized. *See id.* An example of this type is when an employer fires an employee for reporting another employee's illegal activities: There is no legislative enactment directly governing the act of reporting

such conduct, but a number of courts have recognized a public policy that encourages employees to do so, based on the statutes prohibiting the illegal conduct itself. *See id.* (citing an example of termination for reporting another employee's act of theft).

The parties appear to agree that the public policy at issue here is the fourth type because Plaintiffs allege that their termination resulted from their participation in "blowing the whistle" on Defendant's alleged fraudulent conduct vis-a-vis the state. The district court granted summary judgment on the ground that Plaintiffs did not have probable cause to believe that Defendant was engaged in fraudulent conduct. However, we need not follow the district court down that analytical path and undertake the thorny consideration of what constitutes probable cause in the context of retaliatory discharge claims. We can affirm the district court on an alternative basis so long as it would not be unfair to Plaintiffs for us to do so. *See Meiboom v. Watson*, 2000-NMSC-004, ¶ 20, 128 N.M. 536, 994 P.2d 1154 (explaining that an appellate court may affirm a trial court's ruling on a ground that was not relied below if reliance on the new ground would not be unfair to the appellant).

Even if we assume that a plaintiff's probable cause to believe a crime has been committed is a prerequisite to a retaliatory discharge claim, there is no evidence in the record before us that Defendant engaged in any wrongdoing that would give rise to a probable cause analysis. The undisputed facts establish the following. Defendant

and the state executed a letter of intent memorializing Defendant's desire to gift "the greater part of its real and personal property" to the state. The letter stated that "[s]ome items will be excluded" and that "[a] complete inventory of all items to be gifted will be developed through a final agreement." Before a final agreement was presented to the state, Mr. Hubbard, the president of Defendant, decided that he did not want to include the two Remington paintings and the Russell sculpture in the gift to the state. No one affiliated with Defendant ever represented to the state that these three pieces would not be among the excluded items or that they would affirmatively be part of the gift. No one affiliated with Defendant ever provided to the state an inventory that included the three pieces. Nonetheless, even though Defendant had not made any representation to the state about the specific pieces that would be included in the gift, Plaintiff McPeek told the state's head conservator that the three pieces had been deaccessioned. Although Defendant drafted and signed an agreement of declaration and acceptance of gift, there is no evidence that the state ever executed the agreement. The state ultimately told Defendant that it was no longer interested in the gift.

Taken together, these undisputed facts establish only that Defendant and the state were engaged in preliminary negotiations for an agreement that would set out the terms of a gift from Defendant to the state. No agreement was ever reached. It is

11

entirely possible or even likely that the state elected not to enter into the agreement because the three pieces were not to be included in the gifted property. Be that as it may, the hopes and desires of neither the state nor Defendant came to fruition in an agreement of any sort. We fail to understand why public policy would or should encourage Plaintiffs' actions, which sought to disclose nothing more than an alleged flaw in negotiations that never resulted in an agreement. *See Vigil*, 102 N.M. at 689, 699 P.2d at 620 (explaining that an employee seeking to recover for retaliatory discharge "must demonstrate that he was discharged because he performed an act that public policy has authorized or would encourage, or because he refused to do something required of him by his employer that public policy would condemn"). Furthermore, the inventory Defendant presented to the state made it clear that the three pieces were not to be included in the gift. Therefore, Plaintiffs' "disclosures" to the state were entirely premature.

Our conclusion is consistent with New Mexico law, which establishes that "mere wrongdoing on the part of the employer, without a sufficient public policy nexus, is insufficient to state a claim." *Maxwell v. Ross Hyden Motors, Inc.*, 104 N.M. 470, 473, 722 P.2d 1192, 1195 (Ct. App. 1986). In the present case, Plaintiffs failed to establish a prima facie case that Defendant had engaged in any wrongdoing at all. In the absence of wrongful conduct, we cannot say that public policy would encourage

Plaintiffs' reporting of Defendant's actions. Moreover, allowing Plaintiffs' claim to proceed under these circumstances would unduly broaden the retaliatory discharge exception to at-will employment. At-will employment remains the rule in the absence of an employment contract, and retaliatory discharge is a *limited* exception to that rule. *See id.* (stating that *Vigil* "simply adopted a limited public policy exception" to the at-will rule (internal quotation marks omitted)). The purpose of the exception "is job security, not reparation for every conceivable ill." *Silva v. Am. Fed'n of State, County & Mun. Employees*, 2001-NMSC-038, ¶ 11, 131 N.M. 364, 37 P.3d 81 (internal quotation marks and citation omitted).

Although our analysis departs somewhat from the district court's reliance on the absence of probable cause, it is not unfair to Plaintiffs because the parties submitted arguments in the district court on the issue of whether Plaintiffs' actions were of the sort that public policy would encourage. We conclude that the district court properly granted Defendant's motion for summary judgment.

**CONCLUSION**

For the foregoing reasons, we affirm the district court's judgment in favor of Defendant.

13

**IT IS SO ORDERED.**

_____

**CYNTHIA A. FRY, Chief Judge**

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**TIMOTHY L. GARCIA, Judge**

14